# CRIMINAL COURT OF BALTIMORE CITY, PART 2.

Filed March 30, 1899.

## STATE OF MARYLAND
### VS.
### HENRY M. BROADBENT.

*Henry Duffy* for State.
*Wm. Pinkney Whyte* for traverser.

**SHARP, J.—**

The traverser is indicted under the Act of 1898, chapter 306. The charge is that the traverser, being a dairyman and herdsman and private individual supplying milk to cities, towns and villages, unlawfully did fail, neglect and refuse to register his herd and cattle with the Live Stock Sanitary Board, according to the provisions of the Act of Assembly, etc.

The Act of 1898, chapter 306, is entitled "An Act to add certain new sections to Article 58 of the Code of Public General Laws, title 'Live Stock,' under the new sub-title 'Dairies,' to follow section 18 in proper numerical order." The Act contains four sections, numbered 19, 20, 21 and 22. Section 19, under which the traverser is indicted, is as follows:

"It shall be the duty of all dairymen, or herdsmen, or private individuals, supplying milk to cities, towns and villages, to register their herds or cattle with the Live Stock Sanitary Board, in violation of which the parties offending shall be fined not less than $1 nor more than $20 for each offense."

Section 20 provides:

"It shall be the duty of the Live-Stock Sanitary Board to have inspected at least annually, without notice to the owner or those in charge of any dairy, or parties supplying milk, as named in section 19 of this Article, the premises wherein cows are kept, and if such premises are found in an unsanitary condition the said board may prohibit the sale and shipment of milk from such premises until such time as the premises shall conform to the following sanitary rules."

Seven rules to be observed in the construction and use of stables and dairies and in the care of cows are then provided. It is then enacted in section 20:

"And any person who shall ship or sell milk contrary to the aforesaid order of said board shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one dollar nor more more than twenty dollars for each day during which shipments shall be made after notice of such order."

Section 21 provides that the Live Stock Sanitary Board shall furnish certificates of health to owners of herds, and section 22 appropriates the sum of $3,000 to carry out the provisions of the Act. Sections 21 and 22 are not involved in the present controversy, and are mentioned merely to show the entire scope of the law.

The traverser demurs to the indictment, and in support of his demurrer contends:

"1. The statute in question is void because it conflicts with the Declaration of Independence, in that it violates the principles of equal rights; for all of the citizens of the United States are endowed with the right to life, liberty and the pursuit of happiness."

"2. It is repugnant to the Fourteenth Amendment of the United States Constitution:

'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws'."

"Against the 23d Article of Bill of Rights of Maryland:

"3. That no man ought to be in any manner deprived of his life, liberty or property but by the judgment of his peers or by the law of the land."

"4. It is not a valid exercise of the police powers of the State."

"5. It places the livelihood of a large class of men at the mercy of a board vested with arbitrary powers."

It is not contended by the traverser that the constitutional guaranty of equal protection of the laws requires that laws should in all cases operate equally on all persons in the State. The power of classification is conceded and it is also conceded that it is sufficient when classes are created that

the law shall operate equally on all persons in the class. The law on this point is well settled and the cases are numerous.

The contention in this case is that the classification made in the Act of 1898, Chapter 306, is not a valid classification and that the traverser is subjected to expensive, unjust and oppressive regulations from which others occupying a precisely similar position are exempt. The contention is that dairymen, herdsmen and private individuals who supply milk to cities, towns and villages have been subjected to regulations which do not apply to other dairymen, herdsmen and private individuals selling milk; in other words that supplying milk to cities, towns and villages is not a proper foundation for a classification.

In the case of the Gulf, Colorado and Santa Fe Rd. Co. vs. Ellis, 165 U. S. 150, this subject was fully considered. The Supreme Court of the United States in the opinion in that case says:

"But it is said that it is not within the scope of the Fourteenth Amendment to withhold from States the power of classification, and that if the law deals alike with all of a certain class it is not obnoxious to the charge of a denial of equal protection. While as a general proposition this is undeniably true," * * * "yet it is equally true that such classification cannot be made arbitrarily. The State may not say that all white men shall be subjected to the payment of attorneys' fees of parties successfully suing them and all black men not. It may not say that all men beyond a certain age shall be alone thus subjected or all men possessed of a certain wealth. There are distinctions which do not furnish any proper basis for the attempted classification. That must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis."

See also Bells Gap R. W. Co. vs. Pennsylvania, 134 U. S. 232; Adams Express Co. vs. Ohio, 165 U. S. 194; W. U. Rl. Co. vs. Indiana, 165 U. S. 304; In re Grice, 79 Fed. Rep. 627.

It was agreed at the hearing that there are dairymen, herdsmen and private individuals who do not sell milk to cities, towns and villages, and that among them are at least the following classes of persons, viz: those who sell to persons living in country neighborhoods, those who sell to creameries situated in the country and which make butter and cheese, those who sell to country store keepers, and those who sell to middlemen.

It is contended for the State in support of the validity of the law that milk is an important article of food and a fruitful source of disease, that it is particularly important in the diet of the sick and young, and that the public health requires that the milk supplied the community should be nutritious and pure; that this can be attained by the proper construction and use of stables and care of cows, and in no other way, and that to secure this the State may, by virtue of its police power, regulate the construction and use of stables and the care of cows. It is then contended in support of the classification, and no other reason was suggested, that the object of the Legislature in requiring those who sell milk to cities, towns and villages was to control only the large dealers, and to exempt the farmers and small dealers. It is said it would be impossible for the last to construct and maintain their stables in the manner required by the Act, and make a profit out of the business. For this reason it is said they were exempted.

It is not the existence of the power to pass laws regulating the construction and use of stables and care of cows belonging to persons engaged in selling milk which is now in controversy; it is the unequal, arbitrary and oppressive maner of its exercise which is complained of.

Classification "must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without such basis."

The object of the law is the protection of the health of the people of the State: but the proposed classification bears no just relation to that purpose. It does not appear that those supplying milk to cities, towns and villages keep their stables in any worse condition than others or that their cows are not as well cared for. It cannot be said that the inhabitants of cities, towns or villages are more liable to

disease caused by impure milk than others, or that they have any peculiar need for the protection of such legislation. No reason appears why the Legislature should be more solicitous of the health of residents of cities, towns and villages than of the health of those residing in the country. No reasons exist requiring, on account of the health of the community, that they should be the subject of special regulations. All dairymen, herdsmen and private individuals stand in precisely the same relation to the object of the law. The injury to the public from impure milk is the same in any case. The obligation to supply pure milk is as great in the case of those selling in country neighborhoods as in the case of those selling to cities, towns and villages.

It was suggested at the hearing that the reason for the distinction was the desire to exempt the small producer, and it is said that those supplying milk to cities, towns and villages, are all large dairymen, with extensive stables and a large number of cows. This fact, however, is not proven; but, if true, the small producer causes the same mischief, the difference is merely in the extent of the evil. Moreover, the supposed protection is not real. No one need be deterred from selling milk to cities, towns and villages by the Act. The small producer can sell to middlemen, country storekeepers and creameries, who can sell to cities, towns and villages, without being liable to prosecution under the Act. The Act admits of easy evasion. It would be unreasonable to require those selling directly to cities, towns and villages, to comply with expensive and troublesome regulations from which those selling indirectly in the way indicated, are exempt.

The Act subjects the traverser to expensive and troublesome regulations, and an arbitrary procedure which may in some cases be unjust and oppressive, from which others having the same ability to do the mischief intended to be prevented, and who are practically in precisely the same situation as the traverser, are exempt. The Act denies to him the equal protection of the laws, and is, for that reason, null and void.

There is another fatal objection to the validity of the law.

It is provided in section 20 "that any person who shall sell milk contrary to the aforesaid order of the Board shall be guilty of a misdemeanor, and upon conviction shall be fined not less than one dollar nor more than twenty dollars for each day during which shipment shall be made after notice of such order." It is true the defendant is not indicted under this section, but sections 19 and 20 must stand or fall together; they are part of the same plan and are so related in substance and object that it is impossible to suppose that one would have been enacted without the other. Section 19 would be without meaning or purpose apart from section 20.

The misdemeanor created is not the failure to keep the stables and cows in the condition required by the Act, but the failure to comply with the order of the Board. The Act will bear no other construction. "If such premises are found in an unsanitary condition the said Board may prohibit the sale and shipment of milk until such time as the premises shall conform" to the rules provided in the Act. "Any person who shall ship or sell milk contrary to the aforesaid order of the said Board shall be deemed guilty of a misdemeanor and shall be fined not less than one dollar nor more than twenty dollars for each day during which shipment shall be made contrary to the order of said Board."

It being made a misdemeanor to disobey the order of the board, it is important to examine the powers and procedure of the board in passing such an order.

It is provided in section 20 that if the premises "are found in an unsanitary condition" the said board may prohibit the sale and shipment of milk until such time as the premises shall conform to the following sanitary rules. These rules would also govern the board in determining whether the premises were in an unsanitary condition before the order was passed.

All the rules, except Rule 2, give the broadest powers to the board. It is unnecessary to discuss all the rules, but Rule 1 may be taken as illustrative of the very broad and autocratic powers conferred.

"Rule 1. No building or shed shall be used for stabling cows for dairy purposes which is not *well lighted* and

*well ventilated*, and which is not provided with *sufficient feed* trough or box and suitable floor, laid with *proper* grades and channels to immediately carry off all drainage; and if a public sewer abuts the premises upon which such building is situated they shall be connected therewith *whenever the inspector considers such sewer connection necessary.*"

The board are to determine whether the premises are *well lighted and ventilated*, whether the premises are provided with *sufficient* feed troughs and suitable floor, laid with *proper* grades, and if a public sewer abuts on the premises they may require that the dairy be connected therewith whenever the *inspector considers such connection necessary.* Rules 3, 4, 5, 6 and 7 contain numerous other powers of a similar character.

The procedure provided by the Act is summary. The board acts after an inspection which the Act provides shall be *without notice* to the owner or those in charge of the dairy. In other words, after a secret inspection, the Board may arbitrarily, without a hearing, summarily stop the business of a dairyman.

There may be differences of opinion about whether a dairy is *well* ventilated and *well* lighted, whether it is provided with sufficient feed troughs or a *suitable* floor, laid with *proper* grades and channels, or whether the opinion of the inspector that a sewer connection is necessary is well founded; or about the many other matters in which the will of the Board is final by the terms of the act; yet without notice or opportunity to be heard or to produce evidence, the Board may arbitrarily prohibit the sale of milk, subject the owner to the loss of his property and the injury and possible destruction of his business, and he is without remedy. The Board may be influenced by prejudice or ill-will, favoritism or rivalry, their judgment may be entirely erroneous: yet the dairyman must submit. There is no appeal.

Such powers may be lawful in a despotic and half-civilized country, but have no place in our system of government. The attempt to confer them is utterly null and void. The procedure contemplated is lacking in the essential ideas of "due process of law," viz: notice and an opportunity to be heard.

The decision of the Court of Appeals of Maryland in Mayor and City Council vs. Radecke, 49 Md. 230, in deciding that an ordinance of the Mayor and City Council requiring Steam engines in Baltimore City to be removed on six months' notice by the Mayor is distinctly applicable to and conclusive of this case. The Court says that the ordinance "does not profess to prescribe regulations for their construction or use nor require such precautions and safeguards to be provided by those who own and use them as are best calculated to render them less dangerous to life and property, nor does it restrain their use in box factories and other similar establishments within certained defined limits, nor in any other way attempt to promote their safety and security without destroying their usefulness. But it commits to the unrestrained will of a single public officer the power to notify every person who now employs a steam engine in the prosecution of any business in the city of Baltimore to cease to do so, and by providing compulsory fines for every day's disobedience of such notice and order of removal, renders his power over the use of steam in that city practically absolute, so that he may prohibit its use altogether. But if he should choose to do this, but only to act in particular cases, there is nothing in the Ordinance to guide or control his action. It lays down no *rules* by which its *impartial execution* can be secured or partiality and oppression prevented. It is clear that giving and enforcing these notices may, and quite likely will, bring ruin to the business of those against whom they are directed, while others from whom they are withheld, may be actually benefited by what is thus done to their neighbors, and when we remember that this action or nonaction may proceed from enmity of prejudice. from partisan zeal or animosity. from favoritism and other improper influences and motives easy of concealment and difficult to be detected and exposed. it becomes unnecessary to suggest or to comment upon the injustice capable of being wrought under cover of such a power, for that becomes apparent to every one who gives to the subject a moment's consideration. In fact. an ordinance which clothes a single individual with such power, hardly falls within the *domain*

*of law*, and we are constrained to pronounce it inoperative and void. Resting our decision as to the invalidity of this ordinance on this ground, we shall not consider the question whether it is also void as an unauthorized delegation of a public power or trust."

It follows from what has been said the demurrer must be sustained.